IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Case No. 09-cv-00342-PAB-MEH

LORETTA KUYPER and
K.K., by and through her mother and next friend Loretta Kuyper,

     Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF WELD COUNTY, COLO.,
DESIREE FLORES, in her individual capacity, and
BARBARA SCHWABE, in her individual capacity,

     Defendants.

---

**ORDER**

---

     This matter is before the Court on defendants' motion to dismiss ("Defs.' Mot.")

[Docket No. 36] plaintiffs' second amended complaint ("2nd Am. Compl.") [Docket No.

34]. The motion is fully briefed and ripe for disposition.

## I. BACKGROUND

     The following facts are taken from plaintiffs' second amended complaint and are

presumed to be true for purposes of this motion. Loretta and Clint Kuyper have served

as foster parents for the Weld County Department of Social Services ("WCDSS") since

approximately April 2003. During their first month as foster parents, they took custody

of K.K., who was a newborn at the time, through WCDSS. The Kuypers legally adopted

K.K., a girl, in January 2005. The Kuypers have provided foster care to a number of

other children in the years since they first took K.K. into their home.

On March 6, 2007, defendants Desiree Flores ("Flores") and Barbara Schwabe ("Schwabe") of WCDSS contacted Loretta Kuyper ("Kuyper"), informing her of an emergency need to place a 12-year-old boy named I.G. into a new foster home.[1] An emergency is a situation where a foster child's health, safety, or welfare is endangered. Flores and Schwabe informed Kuyper that I.G.'s current foster parents required him to do excessive chores around the house. Flores and Schwabe were aware that the Kuypers had three young females and one boy in their home. Kuyper also previously had communicated to Flores and Schwabe her strong preference against having male foster children and her concern regarding taking in any child with a history of sexual misconduct. It was the Kuypers' practice to inquire regarding such past history whenever contacted about a possible placement.

WCDSS had a contractual obligation to share available information with the Kuypers concerning a prospective foster child, including the child's social, medical, educational, and behavioral history. WCDSS was also obligated to notify the Kuypers of any special needs they would be required to address while acting as a child's foster parent. In past instances, the Kuypers had declined prospective placements in light of information received from WCDSS regarding the child. In the case of I.G., Flores and Schwabe assured Kuyper that I.G. had no history of sexual abuse or misconduct.[2] In

---

[1] The complaint is unclear regarding how many calls were placed to the Kuypers on that date and whether both Flores and Schwabe were on any or all of the calls together. The complaint is clear, however, that during one or more calls on May 6, 2007, both Schwabe and Flores possessed the same knowledge and communicated the same information to Kuyper.

[2] Flores and Schwabe were aware that placing I.G. with the Kuypers would violate its policy regarding the number of children in a single residence.

light of the stated emergent need and the assurances they received, the Kuypers accepted I.G. into their home along with his two sisters.

Nine days later, on March 15, 2007, three-year old K.K. cried out and revealed to the Kuypers that I.G. had sexually abused her on multiple occasions. Kuyper immediately contacted WCDSS to demand I.G.'s removal from their home. The Weld County Sheriff's Office initiated an investigation, and the Weld County District Attorney ultimately charged I.G. with sexual assault.

The Kuypers have since learned that I.G. has a history of sexual misconduct, having been disciplined by his school for an incident of inappropriate fondling of a classmate. After that incident, an adult was required to accompany I.G. between classes. The school informed WCDSS of this behavior and the subsequent discipline before Flores and Schwabe contacted Kuyper on March 6, 2007. Additional incidents of sexual misconduct involving I.G. and other children in his previous foster home were revealed to WCDSS and defendants Flores and Schwabe after the incident at school and before March 6, 2007.

The Kuypers and K.K. have received counseling to deal with their trauma. The Kuypers expect that K.K. will require counseling for some time. Kuyper, for herself and on behalf of K.K., has raised three claims for relief, seeking recovery for, among other things, emotional distress. The first claim for relief alleges breach of contract, while the second and third claims for relief allege violations of substantive due process rights arising out of the danger created by defendants' conduct and the failure of defendant Board of County Commissioners of Weld County ("BOCC") to adequately train and supervise defendants Flores and Schwabe. Defendants argue that dismissal of the

3

complaint is required because it does not state a claim that Flores and Schwabe violated the plaintiffs' substantive due process rights.

## II. STANDARD OF REVIEW

Dismissal of a claim under Rule 12(b)(6) is appropriate where the plaintiff fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). For a complaint to state a claim it must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. (8)(a)(2). Rule 8(a)'s "short and plain statement" mandate requires that a plaintiff allege enough factual matter that, taken as true, makes his "claim to relief . . . plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's Complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quoting *Sutton v. Utah St. Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). At the same time, however, a court need not accept conclusory allegations. *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erikson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (omission marks omitted). The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible. *Bryson*, 534 F.3d at 1286.

However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1950 (2009) (internal quotation marks and alteration marks omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alteration marks omitted).

Furthermore, the Tenth Circuit has outlined the application of *Twombly* to cases where state officials raise the defense of qualified immunity:

> Although we apply "the same standard in evaluating dismissals in qualified immunity cases as to dismissals generally," complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants. The *Twombly* standard may have greater bite in such contexts, appropriately reflecting the special interest in resolving the affirmative defense of qualified immunity "at the earliest possible stage of a litigation." Without allegations sufficient to make clear the "grounds" on which the plaintiff is entitled to relief, it would be impossible for the court to perform its function of determining, at an early stage in the litigation, whether the asserted claim is clearly established.

*Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) (citations and footnote omitted). The complaint must "make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her." *Id.* at 1250 (alterations omitted).

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, --- U.S. ----, 129 S. Ct. 808, 815 (2009). Qualified immunity provides a defense to trial and the other burdens of litigation such as discovery, rather than just liability. *See Saucier v. Katz,* 533 U.S. 194, 200 (2001), *overruled on other grounds by Pearson*, 129 S.Ct. 808. Therefore, a court is to resolve questions of qualified immunity at the earliest possible stage of litigation. *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6 (1987). However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard. *Currier v. Doran,* 242 F.3d 905, 916-17 (10th Cir. 2001). And, "although the decision in *Harlow* was motivated by a concern that public officials be protected from the costs associated with defending against lawsuits, particularly baseless ones, it did not follow that a defendant's claim of qualified immunity could always be resolved before at least some discovery was conducted." *Id.* at 914 (citing *Crawford-El v. Britton*, 523 U.S. 574, 591-93 & 593 n.14 (1998)).

## III. DISCUSSION

Defendants have raised the defense of qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Upon a public official's assertion of a qualified immunity defense, plaintiff bears a "heavy burden" under a two-pronged analysis. *Buck v. City of Albuquerque,* 549 F.3d 1269, 1277 (10th Cir. 2008). Until recently, the plaintiff was required to "first establish that the defendant's actions violated a constitutional or statutory right." *Smith v. Cochran,* 339 F.3d 1205, 1211 (10th Cir. 2003) (quoting *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1185 (10th Cir. 2001)). After establishing that threshold question, the plaintiff had to establish that the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). The Supreme Court recently altered the qualified immunity analysis by holding that the "mandatory, two-step rule for resolving all qualified immunity claims should not be retained." *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 817 (2009). Instead, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson,* 129 S.Ct. at 818.

The determination of whether a violation occurred under the first prong of the qualified immunity analysis turns on substantive law regarding that right. *See, e.g., Casey v. City of Fed. Heights,* 509 F.3d 1278, 1282-83 (10th Cir. 2007). On the other hand, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Casey,* 509 F.3d at 1283-84 (quoting *Saucier,* 533 U.S. at 202; *see also Anderson v. Creighton,* 483 U.S. 635, 640 (1987). "A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Gann v. Cline,* 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting *Anderson v. Blake,* 469 F.3d 910, 914 (10th Cir. 2006)) (internal quotation marks omitted).[3] However, "contrary authority from other circuits does not preclude a finding that the law in this circuit was clearly established, if the contrary authority can be distinguished."

_____

[3]In *Prison Legal News, Inc. v. Simmons*, 401 F. Supp. 2d 1181, 1189-90 (D. Kan. 2005), the court noted that the quoted language "from other circuits" appears to be a misquote of the Tenth Circuit's decision in *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992), where the court used the language "from other courts." That misquote first appeared in *Murrell v. School District No. 1, Denver, Colo.*, 186 F.3d 1238, 1251 (10th Cir. 1999), and has since appeared repeatedly in Tenth Circuit cases. The *Prison Legal News* court, though concluding that the "misquote was merely a scrivener's error" and was not meant as a substantive change to the legal standard, added that "the fact that this error has not been discussed in a reported case from the Tenth Circuit suggests that the error may not be very significant." 401 F. Supp. 2d at 1191. "In other words, although the circuit may be willing to consider cases from courts beyond the federal appellate courts, the focus should normally be on cases decided by other circuits." *Id.* The Court largely agrees and, in any event, finds that the result in this case does not turn on which language is used. Tenth Circuit law provides a sufficient basis upon which to resolve the question before the Court.

*Currier v. Doran,* 242 F.3d 905, 923 (10th Cir. 2001).

### A.  Substantive Due Process – State Created Danger Doctrine

Plaintiffs allege a violation of their substantive due process rights by defendants Flores and Schwabe.  The Due Process Clause of the Fourteenth Amendment prohibits state deprivation of "life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "As the Supreme Court has explained, the Due Process Clause 'guarantees more than fair process.'"  *Seegmiller v. LaVerkin City*, 528 F.3d 762, 766 (10th Cir. 2008) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)).  The Clause also provides substantive protection, "'barring certain government actions regardless of the fairness of the procedures used to implement them.'"  *Id.* at 766-67 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)).  "In its substantive mode, the Fourteenth Amendment provides protection against arbitrary and oppressive government action, even when taken to further a legitimate governmental objective."  *Id.* at 767 (citing *Lewis*, 523 U.S. at 845-46).  The substantive due process doctrine has two strands: "One strand protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience." *Seegmiller*, 528 F.3d at 767 (citing *Chavez v. Martinez*, 538 U.S. 760, 787 (2003) (Stevens, J., concurring in part and dissenting in part)).  Plaintiffs' allegations arise out of the latter strand.  To constitute conscience shocking behavior, the government action must be "arbitrary and unrestrained by the established principles of private right and distributive justice." *Seegmiller*, 528 F.3d at 767 (quotation marks and citations omitted).

The Supreme Court has made clear that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Lewis*, 523 U.S. at 767.[4]

While generally "state actors are liable under the Due Process Clause only for their own actions and not the actions of private citizens," there are two exceptions to this general rule. *Johnson v. Holmes*, 455 F.3d 1133, 1141 (10th Cir. 2006). "State officials may be subject to constitutional liability if they: (1) create a danger that results in a harm to an individual, even if that harm is not ultimately inflicted by a state official; or (2) if the state has a 'special relationship' with the individual who is harmed by the third party." *Id.* It is the former exception upon which plaintiffs rely. *See Currier v. Doran*, 242 F.3d 905, 917-18 (10th Cir. 2001) ("[S]tate officials can be liable for acts of third parties where those officials created the danger that caused the harm.") (quotation marks and citations omitted).

To succeed on a danger creation claim,

> Plaintiff must demonstrate that (1) [Plaintiff] was a member of a limited and specifically definable group; (2) Defendants' conduct put [Plaintiff] . . . at a substantial risk of serious, immediate and proximate harm; (3) the risk was obvious or known; (4) Defendants acted recklessly in conscious disregard of that risk; and (5) such conduct, when viewed in total, is conscience shocking.

---

[4]Furthermore, and as already noted above, "[i]n order to discern whether the facts of a particular case 'shock the conscience' so as to support a substantive due process claim, '[the Court] must bear in mind three basic principles highlighted by the Supreme Court . . .: (1) the need for restraint in defining [the] scope [of substantive due process claims]; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety.'" *Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253, 1262 (10th Cir. 1998) (quoting *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995) (internal citations omitted)) (alterations in original).

*Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995).  Moreover, plaintiffs "must also show that the charged state entity and the charged individual defendant actors created the danger or increased the plaintiff's vulnerability to the danger in some way." *Armijo*, 159 F.3d at 1263. "'The key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid.'" *Armijo*, 159 F.3d at 1263 (quoting *Johnson v. Dallas Ind. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994) (internal citations and quotations omitted)).

Defendants contend that plaintiffs' complaint does not make out a claim based on the danger creation theory because defendants are alleged to have taken no affirmative action.  Rather, in defendants' view, plaintiffs allege a failure to act. Defendants are correct that their "actions must involve affirmative conduct; the failure to act, even in the face of a known risk, is insufficient." *Briggs v. Johnson*, 274 F. App'x 730, 734 (10th Cir. 2008) (unpublished).  Furthermore, "'[a]ffirmative conduct for purposes of § 1983 should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration.'  Additionally, the conduct must be directed at the plaintiff, not the public in general." *Id.* at 735 (quoting and citing *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002)).

In *Currier*, a case addressing the placement of children in state custody with their father, the Tenth Circuit concluded that a failure to investigate in the face of ongoing evidence of abuse in the context of the affirmative acts of placing the child in a

dangerous home and discouraging reports of abuse was sufficient to support a finding of affirmative conduct. 242 F.3d at 918-20 & 920 n.7. Similarly, in *Briggs*, the court found that discouraging reports of abuse was sufficiently affirmative. *See Briggs*, 274 F. App'x at 735 ("This court [in *Currier*] concluded plaintiffs' allegation sufficiently set out the requisite affirmative conduct necessary to support a danger creation claim because Medina's alleged conduct 'interfere[d] with the protective services which would have otherwise been available' to the children.") (citation omitted).

In this light, plaintiffs' complaint more than sufficiently alleges affirmative conduct on the part of Flores and Schwabe. The complaint alleges not only that Flores and Schwabe failed to inform them of I.G.'s history of sexual misconduct, but affirmatively "advised and assured Loretta Kuyper that I.G. had no such history." 2nd Am. Compl. at 5, ¶ 24. Furthermore, the complaint alleges that "Flores and Schwabe advised that there was an emergent need to transfer I.G.'s foster care placement because his current placement was unacceptable to the County, in whole or in part, because his current foster providers allegedly required excessive household chores of him." *Id.* at 6, ¶ 25. These affirmative misrepresentations were made in the context of WCDSS's attempt to place a child in the Kuypers' home.[5]

_____

[5] In *Uhlrig*, the Tenth Circuit included the following comparison of cases:

"*Compare Grubbs,* 974 F.2d at 121, 123 (assigning § 1983 liability based on a creation of danger theory where the employee had been led to believe that she would not work with dangerous persons and the employer then left her alone with a dangerous person); *Cornelius,* 880 F.2d at 350, 359 (holding that town clerk who was told that only non-violent inmates would participate in work program had a cause of action against town after it used a violent inmate who then attacked her) *with Collins,* 503 U.S. at 125-26 (city not liable for hazards of sewer when employer did not actively mislead the employee

12

Moreover, the risks created were not, as defendants contend, "of an unlimited range and duration." Defs.' Mot. at 7. Defendants argue that the risk posed by I.G. affected the public at-large, as opposed to being aimed at K.K. The relevant question, however, is whether the affirmative actions taken by defendants were directed at a limited and specifically definable group. Here, they clearly were. In this way, this case is distinguishable from *Ruiz v. McDonnell*, 299 F.3d 1173 (10th Cir. 2002), upon which defendants rely. In *Ruiz*, plaintiffs alleged that a day care center should never have been licensed and recommended to them. The *Ruiz* court concluded, however, that "the improper licensure did not impose an immediate threat of harm. Rather, it presented a threat of an indefinite range and duration. Moreover, the licensure affected the public at large; it was not aimed at J.R. or Ms. Ruiz directly." *Id.* at 1183. Such is not the case here. Unlike in *Ruiz*, the alleged affirmative acts were directed at the Kuypers, despite their specific concerns about the risks posed by placing a child with a history of sexual misconduct in their home. Moreover, the known risk was immediate and defined in scope because defendants knew that I.G. would have the type of close contact with the children in the Kuypers' home that comes with living under the same roof.

As alleged, the conduct was also "obvious" or "known." Defendants argue that the risk should have been mitigated by the expected supervision of the children by the

_____

as to danger he faced); *Lewellen,* 34 F.3d at 347, 351 (public employer not liable for creating a dangerous situation by exposing an employee to electrocution where the employee was not misled as to the nature of the threat)."

*Uhlrig*, 64 F.3d at 575 n.16.

Kuypers. This ignores the nature of the complaint's allegations. Specifically, defendants are alleged to have informed the Kuypers that I.G. had no past history of sexual misconduct and was in need of an emergent placement because of the conduct of his foster parents. These affirmative and knowing misrepresentations were meant to encourage the Kuypers to take the child in by misleading them about his history of sexual misconduct, and thereby gave them no reason to believe that extraordinary supervision was necessary.[6] The Court finds that the complaint's allegation that placing a child with a known history of sexual misconduct in a house with young children, after informing the parents that there was no such history, constitutes conduct in reckless disregard of a risk that was obvious *and* known.[7] Not only did defendants not warn the Kuypers about the risk of sexual assault posed by I.G., they affirmatively led them to believe there was no such risk. *Cf. Uhlrig*, 64 F.3d at 575 n.13 (finding "the warnings

---

[6]Defendants argue that the Kuypers were required to maintain 24 hour supervision over their foster children. To the extent defendants imply that this requires having all the children within eyesight at all times, the Court finds that cannot possibly be required. For purposes of this motion, the Court notes that the complaint alleges the children were in the Kuypers' home. There is no indication that an adult was not aware of the children's location at all times.

[7]Defendants' attempt to distinguish this case from those where the state had custody of the ultimate victim – such as in *Yvonne L. v. N.M. Dep't of Human Servs.*, 959 F.2d 883 (10th Cir. 1992) – conflates the "special relationship" doctrine and the "danger creation" doctrine. *See Armijo*, 159 F.3d at 1261 ("[I]f the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others."); *see generally Maldonado v. Josey*, 975 F.2d 727 (10th Cir. 1992). Here, plaintiffs do not seek to base their substantive due process claim on an allegation that the state had a special relationship with K.K. which triggered a heightened duty to her. *Cf. J.W. and M.R.W. v. Utah*, No. 2:05-CV-968 CW, 2009 WL 2883008, at *3-7 (D. Utah Sep. 3, 2009).

given to Uhlrig as relevant to the inquiry into whether Defendants acted recklessly" in part because "any warnings given to Uhlrig necessarily limited the danger that she faced at work because she could have taken precautions so as not to have been in a situation where she could not defend herself").[8]

Misleading K.K.'s mother also "increased [K.K.'] vulnerability to the danger." *Armijo*, 159 F.3d at 1263. Namely, it stripped her of the very protection defendants now point to when arguing that the plaintiffs have failed to meet their burden of pleading a substantive due process claim. As the *Currier* court outlined when discussing danger creation precedent, "the state can be liable when it affirmatively places private citizens in harm's way by removing what would otherwise be safety valves." *Currier*, 242 F.3d at 922. Cutting off private sources of aid can equally form the basis of liability. *Id.* (""This court has also stated that the state creates danger when it cuts off potential sources of private aid. . . . That the potential aid [defendant's] conduct tended to foreclose was from a state source rather than a private source is not constitutionally significant."). The *Currier* court favorably cited cases where defendants were found liable for cutting off sources of private aid.

For example, in *Dwares v. City of New York*, 985 F.2d 94, 96-97 (2nd Cir. 1993), "[t]he court explained that the police officers' affirmative conduct had made the demonstrators more vulnerable to assault, even if the police officers were under no

---

[8]Here, defendants knew of the danger I.G. posed, concealed evidence of it, and affirmatively misled the Kuypers. *Cf. Uhlrig*, 64 F.3d at 571 ("In ruling that Defendants were not reckless, the [district] court concluded that (1) Defendants did not know of the danger Waddell posed to Uhlrig; nor (2) did Defendants willfully conceal any evidence of that danger or mislead Uhlrig.").

constitutional duty to rescue the demonstrators from an assault."[9]  *Currier*, 242 F.3d at

921-22.  Similarly, in *Freeman v. Ferguson*, 911 F.2d 52, 53-54 (8th Cir. 1990), "the

murder was 'the result of an affirmative act by a state actor to interfere with the

protective services which would have otherwise been available in the community."

*Currier*, 242 F.3d at 922.  In *Ross v. United States*, 910 F.2d 1422, 1431 (7th Cir.

1990), the Seventh Circuit "allow[ed] recovery under the Constitution for injury resulting

from state prevention of private rescue attempt."  *Currier*, 242 F.3d at 922. The *Currier*

court also cited *Tazioly v. City of Philadelphia*, No. CIV.A. 97-CV-1219, 1998 WL

633747, at *11 (E.D. Pa. Sep. 10, 1998).  The *Tazioly* court found that the "state-

created danger theory may apply in cases where a state actor has rendered a minor

more vulnerable to injury at the hands of the minor's biological parent."  *Id.* at *11.  The

*Currier* court noted that, in *Tazioly*, state agents "had actual knowledge that the

biological mother was 'unfit and dangerous.'"  *Currier*, 242 F.3d at 918 (citing *Tazioly* at

*9).

Indeed, the very form of private aid defendants cite in their attempt to avoid the

application of the danger creation theory was the target of defendants' alleged conduct.

One obvious form of protection a parent may offer her child is to prevent risks from

entering the home.  Defendants, with knowledge of the Kuypers' concerns about

children with a history of sexual misconduct, specifically directed their conduct at getting

past that layer of parental protection.  Here, K.K. "would not have been exposed to the

---

[9]The *Dwares* decision was overruled on other grounds by *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

dangers from [I.G.] but for the affirmative acts of the state . . . ."  *Currier*, 242 F.3d at 918.[10]

In this way, this is not, as defendants contend, simply a failure to warn case.  *Cf. Uhlrig*, 64 F.3d at 575 (pointing out, when determining that defendants were entitled to qualified immunity, that plaintiff had been warned regarding the assailant's past, had access to all relevant information about his past, and had not been misled by defendants).  To the extent the complaint alleges a failure to warn, such an allegation must be viewed in light of the overall affirmative attempt by defendants to place I.G. in the Kuypers' home.  *See Currier*, 242 F.3d at 920 n.7 (distinguishing a "failure to rescue . . . once legal custody was given" from the "failure to investigate allegations of abuse . . . in the general context of the state's affirmative conduct in removing the children from their mother and placing the children with their father").  This case is thus distinguishable from *Reed v. Knox County Dep't of Human Servs.*, 968 F. Supp. 1212, 1221-22 (S.D. Ohio 1997), where children already in the custody of the plaintiffs were injured by foster children.  There, the court concluded that "the only affirmative act of commission, as opposed to omission, on the part of KCDHS was to arrange for the placement of the foster children in plaintiff's home."  *Id.* ("This was not a one-sided undertaking forced upon the plaintiffs by KCDHS, since the placement also required the agreement of the plaintiffs.  Under this agreement, [plaintiffs] assumed some degree of

---

[10]The Court considers only those acts allegedly taken by defendants in their successful attempt to place I.G. in the Kuypers' home and not facts going to what the defendants learned or failed to do thereafter.  *See Currier*, 242 F.3d at 919 ("Plaintiffs cannot rely on Defendants' failure to intervene once custody was given to Vargas to state a danger creation claim if the Defendants' affirmative conduct in placing the child with Vargas does not satisfy the *Armijo* danger creation requirements.").

responsibility for the supervision of the foster children.").  Moreover, the parents in *Reed* were provided with information "sufficient to place [them] on notice that these foster children had behavioral problems and required close supervision."  *Id.* at 1222 (adding that gross negligence is not sufficient to trigger the danger creation theory). Defendants' misrepresentations here not only led to the Kuypers agreeing to take I.G. despite their previously expressed resistance to placing children with histories of sexual misconduct in their home, but also deprived them of the information necessary to protect their other children from the risk of harm that I.G. posed.

Finally, plaintiffs' allegations are sufficient to meet the requirement that the state actors' conduct be conscience shocking.  "[T]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.  The level of conduct required to satisfy this additional requirement cannot precisely be defined, but must necessarily evolve over time from judgments as to the constitutionality of specific government conduct."  *Uhlrig*, 64 F.3d at 574.  In that light, "the Due Process Clause's protection against 'conscience shocking' conduct traditionally only involved deliberately wrongful government decisions rather than merely negligent government conduct."  *Uhlrig*, 64 F.3d at 573.  This deliberateness requirement can be satisfied by demonstrating "'an intent to place a person unreasonably at risk,'" which has been defined as "when a state actor 'was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious disregard and unreasonable disregard of the consequences.'"  *Uhlrig*, 64 F.3d at 574 (quoting *Medina*, 960 F.2d at 1496).

With that said, on a motion to dismiss, the relevant question is whether the complaint alleges facts that "could be conscience shocking, depending, of course, on further context provided by discovery." *Currier*, 242 F.3d at 920; *see Briggs*, 274 F. App'x at 736 ("Viewed in total, Briggs has described conduct that could be 'construed as conscience-shocking, depending on context' after the facts are fully developed.") (quoting *Armijo*, 159 F.3d at 1264). While defendants argue countervailing facts in their motion, plaintiffs have satisfied their burden at this stage. Discovery may alter the context in defendants' favor, but, at present, the complaint alleges that Flores and Schwabe affirmatively lied to the Kuypers in order to ease the placement of a child with a history of sexual misconduct in the Kuypers' home.[11]

While defendants are right that "ordinary negligence does not shock the conscience," *Ruiz*, 299 F.3d at 1184, the conduct alleged here constitutes more than negligence. In light of the complaint's factual allegations, the Court "can discern no reasoned justification or policy consideration that would support such conduct." *Briggs*, 274 F. App'x at 736. In short, the Court is convinced that plaintiffs have "'a reasonable likelihood of mustering factual support' for [their] due process claim based on the danger creation theory." *Briggs*, 274 F. App'x at 737 (quoting *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)); *see Armijo*, 159 F.3d at

-----

[11]As noted above, "although the decision in *Harlow* was motivated by a concern that public officials be protected from the costs associated with defending against lawsuits, particularly baseless ones, it did not follow that a defendant's claim of qualified immunity could always be resolved before at least some discovery was conducted." *See Currier*, 242 F.3d at 914 (citing *Crawford-El v. Britton*, 523 U.S. 574, 591-93 & 593 n.14 (1998)).

1264 ("[S]uch conduct, if true, when viewed in total, possibly could be construed as conscience-shocking, depending on context as determined after a full trial.").[12]

In sum, defendants' "conduct meets the danger creation theory of liability." *Currier*, at 919. K.K. was a member "of a limited and specifically definable group," i.e., the children within the Kuyper home. *Uhlrig*, 64 F.3d at 574. The alleged "conduct put [K.K.] . . . at substantial risk of serious, immediate and proximate harm," and "the risk was obvious or known." *Id.* Furthermore, defendants "acted recklessly in conscious disregard of that risk," and their conduct, "when viewed in total, is conscience shocking." *Id.* Finally, defendants "'increased the plaintiff's vulnerability to the danger' through" their affirmative statements to Kuyper regarding I.G. *Currier*, 242 F.3d at 919-20.

**B. Clearly Established Law**

Defendants argue that, even if the alleged conduct constitutes a substantive due process violation, it was not clearly established at the time that "the danger creation theory can be applied to circumstances in which an adopted child living with her parents is harmed by a foster child later placed in that home." Defs.' Mot. at 12. This position

_____

[12]The complaint provides "fair notice" to both Schwabe and Flores, as it sufficiently alleges that they both took part in all of the affirmative conduct. *See Robbins*, 519 F.3d at 1250 (stating that the complaint must "make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her"); *Briggs*, 274 F. App'x at 736 ("[A]lthough Briggs's complaint contains multiple claims against multiple defendants, there is no confusion as to whom the allegation is asserted against. The complaint clearly names Defendants Burgess, Johnson, and Hunter as the individuals who allegedly discouraged the reporting of abuse. It also clearly identifies Burgess, Johnson, and Hunter as the individuals who 'were repeatedly notified of injuries and/or abuse to Kelsey.'") (citation omitted).

too narrowly constrains the inquiry insofar as it implies there must be precisely analogous fact patterns in the case law in order for defendants to have been on notice that their conduct was unconstitutional. *See Buck,* 549 F.3d at 1290 ("The law is clearly established either if courts have previously ruled that materially similar conduct was unconstitutional, or if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct at issue." (internal quotation marks and alteration marks omitted)). If the right asserted by plaintiffs "was 'either expressly established by, or clearly implicit in, existing case law,'" then it is clearly established. *Yvonne L. v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 891 (10th Cir. 1992) (quoting *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 850 (7th Cir. 1990)).

As an initial matter, it is beyond question that the "danger creation" theory is clearly established in the Tenth Circuit. *See Currier*, 242 F.3d at 924 ("In *Armijo* this court determined that 'danger creation jurisprudence was clearly established as a matter of law' by late 1994.") (quoting *Armijo*, 159 F.3d at 1262). More specifically relevant to this case, the *Currier* court framed the specific issue before it in 2001 as follows: "a reasonable state official would have known in 1993 and 1994 that reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional." *Currier*, 242 F.3d at 924. The same was true of the instant defendants in 2007.

That there is not a precisely analogous case decided by the Tenth Circuit does not alter that conclusion. Factual novelty alone will not automatically provide a state official with the protections of qualified immunity. *See Casey,* 509 F.3d at 1284 (noting

that in the Fourth Amendment context, "there will almost never be a previously

published opinion involving exactly the same circumstances"); *Blake,* 469 F.3d at 914

("[A] general constitutional rule that has already been established can apply with

obvious clarity to the specific conduct in question, even though the very action in

question has not previously been held unlawful." (internal quotation marks and

alteration marks omitted)).  The Tenth Circuit employs a "sliding scale" in identifying

clearly established law: "[t]he more obviously egregious the conduct in light of prevailing

constitutional principles, the less specificity is required from prior case law to clearly

establish the violation." *Casey,* 509 F.3d at 1284 (quoting *Pierce v. Gilchrist,* 359 F.3d

1279, 1298 (10th Cir. 2004)).

To the extent the Tenth Circuit has taken the opportunity to extend or clarify the

availability of the theory, it has not, as defendants contend, limited it to contexts where

the ultimate victim was at some point in the custody of the state.  While that was the

factual scenario in *Currier*, the court, as cited above, did not so limit the relevant issue

before it.  Moreover, at the time of defendants' conduct in this case, the Tenth Circuit

had applied the danger creation theory in a case where a school employee increased

an adolescent boy's vulnerability to harm by leaving him at his empty home despite

knowing both that he had voiced suicidal intentions and that there were accessible guns

in the home.  *See Armijo*, 159 F.3d at 1263-64.  In other words, defendants Flores and

Schwabe were on notice that such "conscience shocking conduct that altered the status

quo and placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional." *Currier*, 242 F.3d at 924.[13]

Qualified immunity provides "ample room for mistaken judgments," *Malley v. Briggs*, 475 U.S. 335, 343 (1986). Here, however, there was "no reasoned justification or policy consideration that would support such conduct." *Briggs*, 274 F. App'x at 736; *cf. Casey*, 509 F.3d at 1286 ("[A]n officer's violation of the *Graham* reasonableness test is a violation of clearly established law if there are 'no substantial grounds for a reasonable officer to conclude that there was legitimate justification' for acting as she did.") (quoting *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1197 (10th Cir. 2001)); *Whitington v. Lawson*, No. 06-cv-00759-LTB-CBS, 2009 WL 3497791, at *3 (D.Colo. Oct. 29, 2009) ("Qualified immunity exists so long as reasonable officials in the same situation as the defendants could disagree on the appropriate course of action to follow.") (citing *Holland*, 268 F.3d at 1186). Tenth Circuit precedent, particularly *Currier*, was more than sufficient to put defendants on notice that their conduct violated a clearly established right. Nothing in the case law would lead a social service employee to believe that lying to parents about the threats posed by a child the state actors sought to place in the parents' home would somehow be excepted from clearly established state created danger law in the Tenth Circuit.

Recent dicta by the Tenth Circuit in *Robbins* does not alter that conclusion. In *Robbins*, the Court noted that

---

[13]It is worthy of note that *Currier* also deals, at least in part, with the failure to provide information to those who were charged with protecting the victimized child – in that case, the Children's Court. *Currier*, 242 F.3d at 919.

> [t]he Ninth Circuit, in *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992), imposed liability for danger creation when the state as employer misrepresented to a nurse employed in a state correctional facility that she would not work with violent sex offenders. We too have supposed, in dicta, that if the state "affirmatively misleads an employee of the substantial risks in the workplace, that action may give rise to § 1983 liability." However, we need not decide here whether to extend the 'danger creation' theory to misrepresentations made outside of the context of the state as employer, because the plaintiffs do not allege that defendants made any affirmative statements regarding the quality of the McKinney Daycare.

519 F.3d at 1252 (quoting *Uhlrig v. Harder*, 64 F.3d 567, 575 (10th Cir. 1995)). This dicta from *Robbins* was made in the context of the court's finding that the "allegations of 'lulling' and 'doing nothing' do not give rise to a reasonable expectation of relief, given that *DeShaney* requires an affirmative act before imposing liability." *Id.* at 1252. That the *Robbins* court, in a case regarding an adult state employee, did not need to address whether the danger creation theory could be extended to a different set of circumstances does not vitiate the prior Tenth Circuit precedent relating to affirmative conduct by state actors that increased the vulnerability of minors to harm at the hands of private actors. As the *Robbins* court stated, it "might imagine affirmative acts that could be described as 'lulling'," *id.*, but they simply were not presented with such facts. Here, plaintiffs have alleged not only misrepresentations, but that the defendants made them with the specific intent to persuade the parents to lower their guard, and in the context of an affirmative attempt to place a child into the parents' home. For the reasons stated above, Tenth Circuit case law provided defendants with more than sufficient notice that such conduct could subject them to liability under the danger creation theory.

In sum, under the Tenth Circuit's "sliding scale" regarding clearly established law, although identical facts cannot be found in the case law, general constitutional doctrine combined with the nature of the facts – the affirmative misleading of parents regarding a prospective foster child's history of sexual misconduct and regarding the reason for the emergency placement, so as to persuade the parents to allow the foster child into their home – leads the Court to conclude that the law at issue was clearly established at the time defendants Schwabe and Flores called the Kuypers. "[D]efendants are required to make 'reasonable applications of the prevailing law to their own circumstances.'" *Currier*, 242 F.3d at 923 (quoting *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999)). Here, the defendants failed to do so.

## C. Remaining Claims for Relief

Plaintiffs also bring a claim against the BOCC, alleging a substantive due process violation arising out of the BOCC's failure to adequately train and supervise its employees. In their motion, defendants only argue that the claim must be dismissed because of plaintiffs' failure to adequately allege an underlying substantive due process violation by the individual defendants. Consequently, defendants have waived other potential arguments for purposes of the present motion. As discussed above, plaintiffs' substantive due process claim against Flores and Schwabe survives defendants' motion to dismiss. Therefore, the failure to train and supervise claim survives defendants' motion as well.

Furthermore, defendants ask the Court to decline to exercise supplemental jurisdiction over plaintiffs' state law contract claim in the event the federal claims are

dismissed.  In light of the foregoing, plaintiffs' state law claim also survives defendants'

motion to dismiss.

**IV.  CONCLUSION**

For the reasons state above, it is

**ORDERED** that defendants' motion to dismiss [Docket No. 36] is DENIED.


DATED March 30, 2010.

BY THE COURT:


s/Philip A. Brimmer_____
PHILIP A. BRIMMER
United States District Judge